STRICKLER v. STATE AUTO FINANCE COMPANY.

4-9791                                      249 S. W. 2d 307

Opinion delivered May 19, 1952.

566

*S. L. White,* for appellant.

*R. C. Limerick, Jr.,* for appellee.

*J. W. Barron* and *Wright, Harrison, Lindsey & Upton, Amici Curiae.*

MINOR W. MILLWEE, Justice. This is a suit by appellant, Mrs. Love Strickler, to cancel, on the ground of usury, a note and chattel mortgage which she executed in connection with a loan from appellee, State Auto Finance Company. The complaint charged that, in making the loan, appellee required the purchase of unnecessary and excessive insurance and that service fees charged or deducted from the loan were either altogether fictitious or exorbitant for any services actually rendered and that such charges were made for the sole purpose of concealing the real intent to charge a usurious and illegal rate of interest on the loan in contravention of § 13 of Art. 19 of the Arkansas Constitution.

In its answer appellee admitted making the loan, denied that it was usurious and specifically alleged that the charges made were authorized by Act 203 of 1951 and were not in excess of the maximum rates prescribed in said Act. A cross-complaint was also filed asking for judgment for the full amount of the note, less one payment made by appellant, and for foreclosure of the chattel mortgage given to secure the note.

The chancellor entered a decree for appellee finding that appellant had agreed to the interest, insurance, service, and other charges which bore a reasonable relation to the services rendered by appellee and were proper and not in excess of that allowed by Act 203 of 1951. Although the court also found that appellant failed to prove that appellee committed usury, it was further held that appellee should have required a "decreasing balance" rather than a "level rate" life insurance policy and that the difference of $3.60 in premiums between said policies should be credited against the balance due on the note. It was also held that appellee was not entitled to retain insurance commissions in the sum of $7.35 on the health and accident policy and $1.80 on the

life insurance policy and that these amounts should also be credited to the balance due on the note. Thus the loan contract was purged of the insurance charges found to be excessive and judgment was rendered in favor of appellee for the unpaid balance of the loan in the sum of $317.25 and foreclosure of the chattel mortgage was ordered.

Appellant has been employed by the telephone company in Little Rock for twenty-three years. She obtained two loans from appellee and this suit involves the second loan. She first applied at appellee's Little Rock office for a $200 loan in March, 1951. On that visit appellant waited in the office while appellee's manager obtained a report by telephone from a credit company and the people from whom appellant purchased the household furniture which she mortgaged. The note and mortgage were prepared and executed, and appellant received the proceeds of the loan, within a period of approximately fifteen minutes.

On May 21, 1951, appellant, being in need of money to cover additional expenses resulting from an automobile accident, applied for the second loan involved here. Appellee's manager agreed to make the loan without further inquiry of references or investigation of security. At that time appellant had made two monthly payments on the first loan. Appellant signed a statement of the transaction prepared by the manager setting out the various items making up the second loan as follows:

(1) Amount required to pay balance of first loan....$185.69

(2) Cash received by borrower on loan........................ 104.11

289.80

(3) Life Insurance Premium: full term coverage of $360 for 12 months......................................................... 7.20

(4) Health and Accident Ins. Premium: $30 monthly indemnity................................................................ 21.00

(5) Interest ............................................................................................. 18.00

(6) Service Charge........................................................................... 24.00

Total amount to be repaid....................................$360.00

Appellant executed her note for $360 payable in twelve monthly installments of $30 beginning June 17, 1951, with interest at 10% per annum from maturity until paid and providing that the entire unpaid balance would become due and payable at the option of the holder of the note upon failure to pay any installment when due. Appellant also executed a mortgage on her household furniture to secure payment of the note. Thus appellant secured $289.80 cash, out of which she was required to pay the balance of the previous loan, and to this sum was added total charges of $70.20 making up the total of the $360 note. Appellant testified that at the time of making the second loan she agreed to the various charges, but that she did not need the insurance which she was required to take because her salary would be continued by the telephone company in case of sickness. She further stated that she was financially embarrassed at the time and thought she had to take out the insurance in order to get the loan. There was no inspection of the furniture mortgaged and apparently no inquiry as to insurance on the property.

The two insurance policies were issued by an Arkansas company in which 997 of its 1,000 shares of stock were owned by one man whose two children were also the beneficial owners of all the stock in the appellee corporation except two qualifying shares. Appellee's office manager is licensed as an insurance agent and the certificates of insurance issued to the borrower are either signed by him or another employee in the office at his instance. Appellee corporation retains 50% of all premiums on life insurance policies and 35% of all premiums on health and accident policies. The manager-agent receives no part of the premium but is paid a salary just as any other employee of the corporation.

Appellee's manager stated that the company was making loans under Act 203 of 1951 (Ark. Stats. §§ 67-1301 to 67-1337, Supp. 1951) entitled "Arkansas Installment Loan Law". In an attempt to explain and justify the $24 service charge made pursuant to § 27 (b) of the Act, he testified: "Q: Now Mr. Freemyer ex-

plain to the court what your figures show with reference to the cost of making loans, the actual expenditures involved in making loans? A. I have gone back starting April 1st—that is when we went under this Act—I have taken the total expenses, salaries, all the expenses incurred for the six months' period, and then I have compiled the figures of the total loans made, the notes, and I have included in that figure approximately six thousand dollars in conditional sales contracts which we also purchased during that time, and I have some figures here that will show the exact cost in overhead to the State Auto Finance Company for making loans in one hundred dollar loans and per loan. Q. Now how much money, which is the face amount of your notes, did you lend in the six-month period? A. Two hundred twenty-five thousand, seven hundred twenty-two dollars and twenty-nine cents. Q. Now if you consider those each a one hundred dollar loan, how many one hundred dollar loans would that be? A. Twenty-two hundred fifty-seven, one hundred dollar loan units. Naturally some of the loans were—as a matter of fact the average loan was four hundred one dollars for the period. Q. Now Jim what do you figure, actually computed as your out-of-pocket expense, per one hundred dollar loan? A. $6.92. Q. Per $100? A. Per $100. Q. And you got that figured out— A. From the books. Q. You divided the total expenses? A. The total expenses by the total one hundred dollar loan units. Q. And that is $6.92 a hundred? A. A hundred. Q. Now, if you applied the $6.92 a hundred actual expenses on the loan, to the $360 loan in this case, how much was your actual— A. Twenty-four, thirty-one, I think. I think you wrote this down, 3.6 times $6.92, $24.31. Q. Was the actual cost? A. Was the actual cost on this particular loan. Q. $24.31? A. $24.31. Q. Now this cost of operation that you have includes your salary? A. That is correct. Q. And each one to whom a salary is paid who is actively engaged in processing loans? A. That is correct. Q. And it includes your stenographic work? A. That is correct. Q. And supplies used in making the loans, your telephone charges? A. That is correct. Q. Your credit report

charges, rent and utilities? A. Yes. Q. And that is your cost? A. Complete cost. Q. And that is your cost for making loans? A. Correct. Q. Go ahead, what were you going to say? A. I would like to further state that is all actual expense and there is no salaries paid out of this that weren't earned. In other words, we don't take out this and pay it to somebody that didn't earn it. It is actual expense and I took it myself. Q. And it cost you how much—$24— A. $24.31. Q. And you charged her $24? A. $24. Q. So, your actual cost, you lost $.31c in cost on this loan? A. That is correct.''

On further examination he testified that the only profit derived by the company in the transaction was from the interest and the commission on insurance premiums which it collected. He further stated there was no way of fixing a charge for investigation of a moral risk and that it would be foolish to set a definite charge for such investigation. In most instances the purchase of life and health insurance was required of the borrower and the expense of writing such insurance was included in the total overhead expenses charged to the loan.

Appellee's president testified that the company's plan of operation was worked out after conference with representatives of the State Banking Department and the attorney who drafted Act 203; and that the Banking Department approved the insurance plan, but was not advised by witness that the company would receive a part of the premiums on the policies written.

An examiner of the Banking Department testified that he knew that employees of local loan companies were also licensed as agents for various insurance companies and were taking part of the premiums for writing insurance.

Appellee contends that all the charges made on the loan in question are lawful and specifically authorized by § 27 of Act 203 of 1951 which, says appellee, is merely a codification of the law as previously declared by this court. Section 27, along with § 4 and the first sentence of § 34, are appended at the end of this opinion. It is

true that some of the charges set out in § 27 have been approved by this court, but we are now concerned with the charges sought to be justified in this suit. Insofar as the Act purports to authorize the collection of interest in excess of the constitutional maximum of 10% per annum it is a nullity regardless of the definition given or label attached to the particular charge by the Legislature.

Article 19, § 13 of the Constitution of 1874 provides: "All contracts for a greater rate of interest than ten per cent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law; but when no rate of interest is agreed upon, the rate shall be six per centum per annum." Although this section is self-executing, the Legislature of 1875 passed Act No. 56 pursuant to the constitutional mandate. The first two sections of said act appear as §§ 68-602 and 603 of Ark. Stats., 1947, and read:

"The parties to any contract, whether the same be under seal or not, may agree in writing for the payment of interest not exceeding ten (10) per centum per annum on money due or to become due.

"No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than is in section one [§ 68-602] of this act prescribed."

Thus the Constitution requires the Legislature to prohibit interest in excess of 10% per annum and the lawmakers are powerless to declare that a usurious charge is not to be so considered by the courts.

It is clear that appellee, in fixing the interest charge of $18 on the loan in question, made a discount of 5% of $360, the total of all items making up the loan, including interest, service and insurance charges. Appellant actually received $289.80. In their brief counsel for appellant have set out a computation based on Ark. Stats., § 68-606 showing the amount of interest involved in pay-

ment of a loan of $289.80 in 12 monthly installments at 10% per annum to be $16.84. Hence, says appellant, there was an excess charge in interest alone of $1.16. Regardless of this contention, the loan contract is clearly rendered usurious and void unless the service charge of $24 and the insurance charges of $28.20 can be sustained.

We first consider the service charge of $24 made pursuant to § 27(b) of Act 203. As shown by the testimony of appellee's manager, this charge represents a proportionate part of appellee's total overhead expenses allotted to the loan in question. Counsel have failed to cite any case which authorizes a lender to charge a borrower with a proportionate part of the cost of the lender's general overhead in carrying on the lending business. Such charge has been condemned in several cases in other jurisdictions. Tennessee has a constitutional provision similar to our own. In the case of *Family Loan Co.* v. *Hickerson,* 168 Tenn. 36, 73 S. W. 2d 694, 94 A. L. R. 664 the court, in construing the Tennessee Act, said: "The Legislature could not clothe small loan companies with the right to uniformly charge all borrowers the maximum fees of 3 per cent, per month, in addition to interest on all loans. Had the act been open to no construction other than that it conferred power upon loan companies to charge the maximum fees without reference to the service rendered, it would have been the duty of the court to declare the act void because violative of article 11, § 7, of the Constitution, and because unreasonably discriminatory against other money lenders. *Koen* v. *State,* 162 Tenn. 573, 39 S. W. 2d 283; *McKinney* v. *Hotel Co.,* 12 Heisk., 104; *Caruthers* v. *Andrews,* 2 Cold. 379. . . .

"Nor do we find that the Legislature intended to or could have authorized small loan companies licensed under the act to estimate and charge a fee sufficient to produce any fixed or definite average return on the investment. Legislation in violation of the constitutional restraint upon the power to regulate interest for the use of money could not be enacted so as to confer power upon loan companies or any other lender to contract for and

take more than legal interest in order that such lender may be assured a reasonable return on the investment, and the inclusion of the lender's expenses for rents, salaries of its employees, and losses on loans could not be made legitimate by a statute.''

In *National Bond & Mortgage Corporation* v. *Mahanay*, (Civ. App.), 70 S. W. 2d 236, affirmed with modification in (Com. App.) 124 Texas 544, 80 S. W. 2d 947, the court said: ''The law does not allow a lender to collect from his borrower in excess of 10% interest, his expenses or part of them for conducting generally the business of lending money; nor as applied to this case can a lender lay out a scheme in advance by which it will engage in money lending all over the state of Texas and force each borrower to pay interest and in addition thereto, what the lender conceives to be that borrower's *pro rata* of the lender's costs, office expenses, income taxes, etc.''

In *Joy* v. *Provident Loan Society* (Tex. Civ. App.) 37 S. W. 2d 254, a pawnbroker's charge represented the lender's *pro rata* cost of doing business, but was labeled ''storage charge.'' In holding the charge to be usurious, the court said: ''We are unable to construe the evidence as intending the charges so made to be charges solely and only for special services in the storing of the property pledged. There was no dual relation intended to be created of lender and of storer. So, when the lender required of the borrower that he pay, in addition to the highest legal rate of interest, the *pro rata* part of the overhead or continued expenses of the business, the lender is but foisting upon the borrower its own obligation, irrespective of the outlay on the particular loans. That becomes a profit to the loan society in excess of the highest legal interest, and beyond the statutory authorization solely for the loan of money.'' See, also, *State Bank of Forreston* v. *Brooks,* (Tex. Civ. App.) 51 S. W. 2d 645; *Missouri Discount Corp.* v. *Mitchell,* 216 Mo. App. 100, 261 S. W. 743; *Fowler* v. *Equitable Trust Co.,* 141 U. S. 384, 12 S. Ct. 1, 35 L. Ed. 786.

We conclude that the service charge of $24 is illegal and an attempt to burden a necessitous borrower with excessive interest under another name. The Legislature was, therefore, powerless to validate the charge. In this connection there is considerable argument pro and con by counsel *amici curiae* as to whether § 27 authorizes a lender to make a blanket deduction of the maximum charges regardless of whether or not any *bona fide* services have been rendered, or expenses incurred, on behalf of the borrower. There is merit in appellant's contention that, by the broad references to services "to be rendered" and expenses "to be incurred" in § 27(b), the Legislature did attempt to authorize the $24 service charge. It is noted that charges authorized in other subsections relate to fees and expenses *actually* paid and incurred while subsections (b) and (c) omit use of the word "actual".

It is clear that the Act authorizes deduction of the maximum service charges when the loan is made. *Amici* counsel argue that under § 27 (c) the charges made are merely an advance deposit subject to refund if it is subsequently determined that an overcharge has been made. If the framers of the Act had intended that the maximum charges should be limited to *bona fide* services actually rendered and to such charges as this court has heretofore approved, it would have been an easy matter to have said so in plain language. Instead, vague and indefinite charges are authorized in subsection (b) which are clothed with such presumption of reasonableness and propriety by subsection (c) as to require the borrower to show unreasonableness of the charges by more than a preponderance of the evidence before he can even recover excessive charges.

It is further provided in subsection (c) that "such charges shall not be considered to be interest or compensation for the use or forbearance or detention of money." Contracts including this and similar provisions have been repeatedly condemned by this court as ineffectual devices to evade the Constitution. *Habach* v. *Johnson*, 132 Ark. 374, 201 S. W. 286; *Doyle* v. *American*

*Loan Co.,* 185 Ark. 233, 46 S. W. 2d 803. This proviso is also a patent attempt by the Legislature to usurp a judicial function. Added to all this is the provision that the borrower may finally only recover from a registrant under the Act the excess charges, regardless of the usurious character of the charges, and further that, "the contract of loan shall not be rendered void by reason of such charges." This latter provision is directly in contravention of the constitutional declaration that usurious contracts are void as to both principal and interest.

It is clear from a reading of § 4 and the first sentence of § 34 that the legislative intent was to authorize registrants under Act 203 to collect charges "greater than otherwise permitted by law". When these sections are considered along with § 27 (b) and (c) there arises in our opinion a legislative intent to authorize the collection of more than 10 per cent interest in violation of the Constitution. Even if we are wrong in this conclusion and there was only the intent to allow charges that have been approved by this court, still these sections would so handicap a necessitous borrower as to render impotent his constitutional right to invalidate a usurious contract made pursuant to the Act. The Constitution directs the enactment of laws to prohibit, and not to permit, usury. The invalidity penalty is designed to protect borrowers from imposition and usurious oppression at the hands of rapacious lenders. An attempt by the Legislature to take from the borrower this constitutional shield is just as effective as a direct authorization to the lender to make usurious charges in the first instance. While the Act is ingeniously drawn, the fact remains that the above-mentioned subsections would nullify rights of a borrower which the framers of our fundamental law intended to preserve.

We next consider the insurance charges of $28.20. The evidence discloses that these charges, as well as the $24 service charge, were made after consultation and advice with those officials who sponsored Act 203 and are charged with its enforcement. Appellee's insurance operations were fully sanctioned as being authorized by

and in conformity with § 27 (f) of the Act. Although appellant apparently furnished ample security for the loan by a mortgage on her household furniture, which could have been insured for a small premium, she was required to purchase both life and health policies which she did not want, or need, and which she could ill afford to purchase. We cannot agree with appellee's contention that this requirement represents a proper charge made under a valid collateral agreement.

In *Jernigan, Bank Commissioner* v. *Loid Rainwater Co.*, 196 Ark. 251, 117 S. W. 2d 18, an application for a license to operate as a loan broker pursuant to Act 135 of 1937 was held to have been properly rejected where the applicant proposed to require that insurance be purchased by each borrower in the minimum amount of $1,000. The court said: "It is argued on behalf of appellee that the insurance is worth what it costs, and that no more is charged these borrowers than is charged others who take out similar insurance. This may be true, but the fact cannot be disguised that it is not insurance which the borrower wants. His pressing need is for a small loan, which he accepts upon any terms that may be imposed, and it is no service to the borrower to require him to take something he may not want and can ill afford to have, but which he accepts because his necessity permits no alternative." While that case only involved the validity of a license, it demonstrates this court's reaction to the kind of charges which are sought to be validated in the instant case.

The case of *Wilson* v. *Whitworth*, 197 Ark. 675, 125 S. W. 2d 112, involved a transaction where the lender was also agent for a life insurance company and the borrower was required to purchase excessive insurance in said company. In holding the excessive insurance charges to be interest and the loan usurious this court repeated the following statement approved in earlier cases: "This constitutional inhibition cannot be avoided by any trick or devise, and the courts will closely scrutinize every suspicious transaction in order to ascertain its real nature; and if it appears that the contract is

merely one for the loan of money with the intention on the part of the lender to exact more than the lawful rate of interest, the contract will be declared usurious and void."

Section 35 of Act 203 attempts to authorize registrants to receive commissions on insurance premiums as a profit on a loan in addition to the various other charges authorized by the Act. The facts in the instant case demonstrate the abuses that are bound to arise when such authority is exercised by a lender in connection with the further authority to require life and health insurance in all cases under § 27 (f) without regard to the needs of the borrower. We conclude that the insurance charges made in this case were usurious and unauthorized under the Constitution and that said §§ 35 and 27 (f) are invalid insofar as they purport to validate such charges.

The result of our views is that §§ 4, 27 (b) and (c) and the first sentence of § 34 of Act 203 of 1951 are unconstitutional and void. We discussed related questions concerning the Act in the opinion delivered today in *Winston* v. *Personal Finance Company, infra*, p. 580, 249 S. W. 2d 315.

The decree is reversed and the cause remanded with directions to cancel the note and mortgage executed by appellant, and for such further proceedings as may be necessary.

Justice GEORGE ROSE SMITH, not participating.

### APPENDIX

Section 27. *Maximum Rates of Charge.* Every registrant may make loans of Two Thousand Five Hundred ($2,500) or less for a period of eighteen months or less, and may charge, contract for, collect, or receive interest, charges and fees, and may require fulfillment of conditions on such loans as hereinafter provided.

(a) Charge, contract for, receive or collect interest or discount in advance at a rate not to exceed five per cent (5%) of the principal amount of a contract which is payable in one year by a single payment, or is payable in equal installments amortized over a period of one year. On contracts for periods which are less or greater than one year, the interest or discount shall be computed proportionately on even calendar months.

(b) Charge, contract for, receive or collect a charge agreed upon between registrant and borrower, at the time of making the loan, for services rendered or to be rendered and expenses incurred or to be

incurred, in connection with the said loan or the security therefor, such as investigating the moral and financial standing of the borrower, investigating the security including the preparation of a budget if any, title and similar investigations including taking acknowledgments and closing of the loan, in an amount not in excess of seven (7%) per cent of that part of the principal amount of the contract not in excess of three hundred dollars ($300.00) and five (5%) per cent of that part of the principal amount of the contract not in excess of six hundred dollars ($600.00), and four (4%) per cent on any part of the principal amount of the contract exceeding Six Hundred ($600.00) Dollars, provided that such service charges shall not be collected within four (4) months of a prior contract on which service charge has been collected excepting on that part of a new loan contract or advance which is in excess of the proceeds thereof used to pay off said prior contract.

(c) The charges set forth in such paragraph (b) when not in excess of the maximums provided therein and when agreed to in the loan contract by the registrant and the borrower shall be presumed to bear a reasonable relation to the service to be rendered and probable expense to be incurred and such charges shall be presumed in any suit in any court in this State to be *prima facie* reasonable and proper and such charges shall not be considered to be interest or compensation for the use or forbearance or detention of money. Before any borrower may recover any sum whatsoever from a registrant whose collections are within the provisions of this section, he must prove by clear, cogent and convincing evidence that the charges collected did not bear a reasonable relation to services rendered and expenses incurred and then such borrower may only recover the difference between the amount agreed upon and the reasonable values of the services rendered and expenses incurred and the contract of loan shall not be rendered void by reason of such charges.

(d) Require repayment of contracts in equal or substantially equal monthly or other equal or substantially equal periodic installments (except that certain installments may be omitted in case of borrowers with seasonal incomes).

(e) Collect from the borrower a delinquent charge of five (5%) per cent on any installment which is in default for five (5) or more days; which delinquent charge shall not be collected more than once on the same installment.

(f) Collect from the borrower, in addition to the foregoing, the premiums actually paid or to be paid for insuring real or personal property securing a loan or advance or collect from the borrower for the premiums actually paid or to be paid for insuring the life and health of the party or parties obligated on a loan or advance, provided that at no time shall life and health insurance be required where other insurance has been required in connection with real or personal property securing a loan in advance; and provided that any such insurance hereinafter described is obtained from an insurance company authorized to conduct such business in the State of Arkansas at rates which do not exceed those lawfully or acceptably filed by qualified insurance companies with the Department of Insurance of Arkansas, and is in an amount not to exceed the reasonable value of the real or personal property insured nor the approximate amount of the loan, whichever is greater, nor the approximate amount of the loan or Fifty ($50.00) Dollars, whichever is greater in the case of life insurance; nor the approximate amount of one monthly installment repayment upon the loan contract in the case of Health and Accident Insurance, provided further that all insurance required pursuant to this subsection is of a type of coverage which bears a reasonable and *bona fide* relation of the existing hazard or risk of loss.

(g) Collect from the borrower the actual fees paid a public official, or agency of the State, for acknowledging, filing, recording or releasing any instrument securing the loan or for actual title insurance or reasonable attorney fees actually paid for searching and insuring titles to real property securing a loan or advance or for noting a lien on the Certificate of Title to a motor vehicle.

(h) Collect from the borrower court costs incurred in the collection of any contract in default and to collect the actual and reasonable expenses of repossession, storing and selling a collateral pledge as security on any contract in default.

Section 4. *Scope.* No person shall engage in the business of making loans or advances of money or credit in amounts of Two Thousand Five Hundred ($2,500) Dollars or less and contract for, charge, or receive directly or indirectly on or in connection with any such loan or advance, any charges whether for interest, compensation, consideration, or expense which in the aggregate are greater than otherwise permitted by law except as provided in and authorized by this law and without first having registered and obtained a Certificate from the Commissioner.

Section 34. If any registrant shall loan or contract for the loan of any amount in excess of Two Thousand Five Hundred ($2,500) Dollars to any one borrower, whether as a part of one transaction or as to the aggregate of more than one transaction, he shall not be entitled to charge, contract for, or receive, either directly or indirectly, upon any such loan or aggregate of such loans, or upon any part thereof, interest charges or fees in excess of that which he would be permitted by law to charge if he were not registered hereunder. . . .